UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 08/21/2019

ATALANTA CORPORATION,

                Plaintiff,

      -against-

MEDITERRANEAN SHIPPING COMPANY S.A.,

                Defendant.

17 Civ. 5333 (AT)

**ORDER**

ANALISA TORRES, District Judge:

Plaintiff, Atalanta Corporation, brings this action against Defendant, Mediterranean Shipping Company S.A., alleging claims under the Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C.A. § 1301 *et seq*., and various state law claims for damage sustained to a shipment of cheese (the "Cargo"). Compl., ECF No. 1. The parties have cross-moved for summary judgment. ECF Nos. 36, 38. For the reasons stated below, both motions are DENIED.

## BACKGROUND

This case arises from alleged damage to Cargo that was shipped inside a refrigerated container (the "Container") from Spain to the United States via ocean carriage. Plaintiff alleges that the Cargo was damaged from exposure to high temperatures before it was loaded onto the vessel for transport to the United States. Numerous parties were involved in the storage, procurement, and transportation of the Cargo to the port in Spain before it was loaded onto the vessel for shipment to the United States. More specific facts are set forth below.

I.    Timeline of Events

The facts alleged are undisputed, unless otherwise noted. On May 26, 2016, Plaintiff issued a purchase contract to Alimentias, E.M.C. ("Alimentias")[1] for the purchase of the Cargo. Pl. 56.1 ¶ 4, ECF No. 39-3; Divasson Alimentias Decl. ¶ 5, ECF No. 38-2; ECF No. 38-3

---

[1] Alimentias "is a producer, wholesaler, and consolidator of food stuffs, prominently cheese products, from the Iberian Penisula (Spain and Portugal)." Divasson Alimentias Decl. ¶ 2.

(purchase contract).[2]  Plaintiff asserts that the Cargo is "temperature-sensitive and [must be] stored and transported at 2 degrees Celsius to maintain shelf life and quality."  Divasson Alimentias Decl. ¶ 6.

In June 2016, Alimentias instructed Desposito Aduranero y Logistico del sur Europa ("DALSE") to fill the order from its inventory.  *Id.* ¶ 5, ECF; Divasson DALSE Decl. ¶ 4, ECF No. 38-9; ECF No. 38-10 (Alimentias Order).  DALSE "manages and operates a certified warehouse located within the Free Trade Zone of Cadiz in the Port of Algeciras, [Spain], and provides related storage, consolidation, and logistics services."  Divasson DALSE Decl. ¶ 2. DALSE "receives and stores Alimentias's temperature-sensitive inventory . . . including cheese products, fills purchase orders from inventory [and] prepares and loads temperature sensitive cargo into refrigerated containers," among other things.  *Id.*

Alimentias, through Bernardino Abad Grupo Logistico ("B. Abad"), then arranged for the transportation of the Cargo from DALSE's warehouse to California.  Divasson Alimentias Decl. ¶ 5.  B. Abad booked the shipment with Defendant, which agreed to transport the Cargo from Spain to California via ocean carriage.  Pl. 56.1 ¶ 17; Divasson Alimentias Decl. ¶ 5.

Defendant issued sea waybill no. MSCUV660339 (the "Sea Waybill") for the carriage of the Container from Algeciras, Spain to Long Beach, California.  Pl. 56.1 ¶ 18; Sea Waybill, ECF No. 38-4.  The Sea Waybill required Defendant to maintain the Cargo's temperature at 2 degrees Celsius (+/- 2 degrees).  Pl. 56.1 ¶ 19; Sea Waybill at § 12.1 ("If a carrying temperature is noted on the front of this Sea Waybill, the Merchant shall deliver the Goods to the Carrier at plus or minus 2 degrees Celsius from the noted temperature, and the Carrier shall exercise due diligence to maintain such supply air temperature, plus or minus 2 degrees Celsius while the Goods are in

---

[2] Plaintiff purchased additional food items under this purchase contract, but they are not an issue in this case.

its possession.").[3]

On June 23, 2016 around 8:00 UTC,[4] Autransa, a trucking company, delivered the Container to DALSE for it to be stuffed with the Cargo. Pl. 56.1 ¶ 7; Thomas Report at 2, ECF No. 39-4; Load Order, ECF No. 39-9 at 3; EIR, ECF No. 39-5 at 1 (listing Autransa as the trucking company).[5] According to Plaintiff, Autransa departed from DALSE's facility with the stuffed Container at 10:45 UTC and transported it to the APM Terminal in Algeciras, Spain (the "Terminal"). Thomas Report at 2–3, ECF No. 39-4; Divasson DALSE Decl. ¶¶ 7(f)(h), ECF No. 38-9. An export Equipment Interchange Report ("EIR") was issued for the Container at 14:04:47 UTC on June 23, 2016 when it was delivered to the Terminal. Pl. 56.1 ¶ 10; EIR at 1; Thomas Report at 3. The EIR stated "LIVE REEFER: NO." Pl. 56.1 ¶ 11; EIR at 1. The Container remained at the Terminal until it was loaded onto the MSC Sealand New York on June 26, 2016 for transport to California. Thomas Report at 3. Under the Sea Waybill, the Cargo was in Defendant's "care, custody, and control" from the time it was delivered to the Terminal at 14:04 UTC on June 23, 2016 until July 19, 2016 when it was delivered to Plaintiff and/or its agents in the California. Pl. 56.1 ¶¶ 16, 21, 41. Plaintiff alleges that the Cargo was discovered to be damaged upon delivery because of "temperature abuse," which Defendant denies. *Id.* ¶¶ 42– 43.

II.    Temperatures

Because the damage at issue in this case was allegedly caused by exposure to excessively

---

[3] The Sea Waybill defines Defendant as the "Carrier," Plaintiff as the "Merchant," and the Cargo as the "Goods." *See* Sea Waybill § 1 (defining terms).

[4] The parties refer to the time of day using both local time and coordinated universal time ("UTC"). The Court will use UTC when describing the events in question.

[5] Defendant "denies the allegation" regarding the date of delivery as unsupported by Plaintiff's evidence, Pl. 56.1 ¶ 7, but has presented no evidence in support of its position. The parties also dispute how long it took to stuff the Cargo into the Container. *Id.* ¶ 8. Plaintiff alleges that it took one hour and twenty minutes. *Id.* Defendant does not state a time frame.

high temperatures, the Court will now consider the evidence relevant to the Cargo's temperature on the days in question.

The Container had a cooling system (the "Refrigeration Equipment").[6] It generated a "Raw Data Report" which provides two ways to assess whether the Refrigeration Equipment was adequately cooling the Cargo. First, the Raw Data Report indicates when the Refrigeration Equipment was powered on and off. Raw Data Report at 2, ECF No. 39-7 (listing event data); Thomas Report at 5 ("The event data records operation parameters, such as power on, power off."). Second, it indicates the supply and return air temperatures for the Container every hour. Thomas Report at 5 ("The supply air and return air temperature sensors . . . average the readings at 1-hour (60-minute) intervals commencing at 0100 hours each day.").

On June 23, 2016, the date the Container was stuffed and delivered to the Terminal, the Raw Data Report indicates that the Refrigeration Equipment was powered on at 8:26 UTC, while the Container was being stuffed, and powered off three minutes later at 8:29 UTC. *Id.* at 2; Raw Data Report at 2, ECF No. 39-7 (listing temperatures and event data for Refrigeration Equipment on June 23, 2016). At that time, both the supply and return air temperatures exceeded 15 degrees Celsius. Raw Data Report at 2. The Refrigeration Equipment was powered back on at 10:47 UTC, when the Container was leaving DALSE's facility. *Id.*; Thomas Report at 2, ECF No. 39-4.[7] At 11:00 UTC the temperatures dropped, with the return air temperature recorded at 9.55 degrees Celsius. Raw Data Report at 2. The lowest recorded return air temperature that day was

---

[6] The Container had a microprocessor unit which included a Compressor-Cycle Perishable Cooling system, which is "a method of temperature control . . . that cycles the compressor on and off according to the return air temperature." Thomas Report at 4.

[7] The Refrigeration Unit was also powered off for fourteen minutes from 10:22 UTC to 10:36 UTC. Thomas Report at 2.

4.22 degrees Celsius at 13:00 UTC.  *Id.*

The Refrigeration Equipment was powered off again at 13:47 UTC—seventeen minutes before it was delivered to the Terminal.  Pl. 56.1 ¶ 31; Raw Data Report at 2; Thomas Report at 3; Jolly Report at 4, ECF No. 31-9.[8]  The recorded return temperature rose to 14.22 degrees Celsius at 15:00 UTC and remained above that temperature for the remainder of the day.[9]  Raw Data Report at 2.

After being turned off at 13:47 UTC, immediately prior to entering the Terminal, the Refrigeration Equipment remained off for 32 hours until it was turned back on under unknown circumstances at 22:19 UTC on June 24, 2016.  Pl. 56.1 ¶ 34; Raw Data Report at 3; Thomas Report at 3.  All of the recorded return temperatures exceeded 14 degrees Celsius until the Refrigeration Equipment was turned back on, at which point the temperatures began to drop and reached 2.37 degrees Celsius return air temperature by 4:00 UTC on June 25, 2016.  Raw Data Report at 3.

## DISCUSSION

### I.  Legal Standard

On a motion for summary judgment, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the initial burden of pointing to evidence in the record, "including depositions, documents[,] . . . [and] affidavits or declarations," Fed. R. Civ. P. 56(c)(1)(A), "which it believes demonstrate[s] the absence of a

---

[8] Defendant filed its exhibits with its 56.1 Statement, rather than with its motion.  *See* Def. Mem. at 1 n.1, ECF No. 37.

[9] A second temperature recording device (the "Temptale") was installed and activated at 10:22 UTC on June 23, 2016 to record ambient temperatures inside the Container.  Pl. 56.1 ¶ 27; Mitchell Decl. ¶ 7(d), ECF No. 38-16.  It recorded ambient temperatures in excess of 2 degrees Celsius for the entire day.  Temptale Data at 3–5, ECF No. 38-21.

genuine issue of material fact," *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party may support an assertion that there is no genuine dispute by "showing . . . that [the] adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B). The non-movant cannot avoid summary judgment "through mere speculation or conjecture" or "by vaguely asserting the existence of some unspecified disputed material facts." *W. World Ins. Co. v. Stack Oil, Inc.*, 922 F.2d 118, 121 (2d Cir. 1990) (internal quotation marks and citations omitted). Where the party opposing summary judgment bears the burden of proof at trial, summary judgment should be granted if the moving party can "point to an absence of evidence to support an essential element of the nonmoving party's claim." *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995). A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). On summary judgment, the Court construes the facts, resolves all ambiguities, and draws all permissible factual inferences in favor of the non-moving party. *See Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003).

"The same standard of review applies when the court is faced with cross-motions for summary judgment." *Clear Channel Outdoor, Inc. v. City of New York*, 608 F. Supp. 2d 477, 492 (S.D.N.Y. 2009) (citing *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001)). In evaluating cross-motions for summary judgment, "[e]ach party's motion must be reviewed on its own merits, and the Court must draw all reasonable inferences against the party whose motion is under consideration." *Id.* (citing *Morales*, 249 F.3d at 121). However, "even when both parties move for summary judgment, asserting the absence of any genuine issues of material fact, a court need not enter judgment for either party." *Morales*, 249 F.3d at 121 (citing *Heublein,*

*Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993)).

II.   Analysis

A.  Plaintiff's Motion for Summary Judgment

Plaintiff moves for summary judgment on the grounds that it has established a *prima facie* case under COGSA.  Pl. Mem. at 1, 5, ECF No. 38-1.

Under COGSA, a plaintiff "who wishes to recover against the carrier for damage to goods bears the initial burden of proving both delivery of goods to the carrier . . . in good condition, and outrun by the carrier . . . in damaged condition." *Transatlantic Marine Claims Agency, Inc. v. M/V OOCL Inspiration*, 137 F.3d 94, 98 (2d Cir. 1998) (internal quotation marks and citation omitted) (alterations in original).  "Once the plaintiff has made out a prima facie case, however, the burden shifts to the defendant(s) to show that one of the statutory COGSA exceptions to liability exists." *Id.*  At issue here is (1) when the Cargo was "delivered" to Defendant and (2) whether it was in good condition at the time of delivery.

1.  Delivery

Although it is undisputed that Autransa trucked the Container carrying the Cargo from DALSE to the Terminal, the parties dispute when the Cargo was delivered to Defendant for liability purposes.  Plaintiff takes the position that "delivery occurred at the time the Container was delivered to Autransa" because Autransa is an agent of Defendant.  Pl. Mem. at 9; Pl. Opp. at 11 n.6, ECF No. 42 ("Autransa was retained by [Defendant] as and/or by its agent/sub-contractor to fulfill its [transportation] obligations under the contract of carriage and Container rental.").  Defendant argues delivery did not occur until 14:04 UTC on June 23, 2016 when the Cargo was delivered to the Terminal because (1) Autransa was not its "servant in any way, shape, or form," and (2) it cannot be liable under COGSA for this segment of the shipment

because the parties had a port-to-port Sea Waybill, which would relieve Defendant of any liability for occurrences unrelated to the ocean carriage.  Def. Opp. at 7, 15, ECF No. 41.

Defendant is correct that Section 5 of the Sea Waybill provides for port-to-port carriage. Sea Waybill § 1 (defining combined transport and port-to-port carriage).[10]  Under Section 5, because the Sea Waybill is port-to-port, the Defendant's "period of responsibility . . . for any loss of or damage to the Goods shall commence only at the moment that the Goods are loaded on board the Vessel and shall end when the Goods have been discharged from the Vessel."  *Id.* § 5.1(a).

"However, parties may contract to apply COGSA during the period before delivery and after discharge and COGSA will be applied when the contract employs sufficiently express language of incorporation."  *Sunpride (Cape)(Pty) Ltd. v. Mediterranean Shipping Co.*, No. 01 Civ. 3493, 2003 WL 22682268, at *4 (S.D.N.Y. Nov. 12, 2003).  In this case, Section 6 of the Sea Waybill modifies the provisions of Section 5, by stating "*[n]otwithstanding the provisions of clause 5 . . .* [t]he provisions of the COGSA are incorporated herein and save as otherwise provided herein shall apply throughout the entire time the Goods are in the Carrier's custody, including before loading and after discharge as long as the Goods remain in the custody of the Carrier or its Subcontractors."  Sea Waybill § 6.1 (emphasis added).  In other words, the parties contracted to extend COGSA's protection beyond the ocean carriage, notwithstanding Section 5. For purposes of analyzing Plaintiff's *prima facie* case under COGSA, if Autransa is a subcontractor of Defendant, then the Court will consider the Cargo "delivered" at the time

---

[10]  A carriage is combined transport "if the Carrier has indicated a Place of Receipt and/or Place of Delivery on the front [of the Sea Waybill]."  Sea Waybill § 1.  "Combined Transport consists of a Port-to-Port carriage and Inland Transport."  *Id.*  Here, the front of the Sea Waybill does not list a Place of Receipt or a Place of Delivery.  *Id.* at 1 ("Place of Receipt: XXXXXXXXXXXXXXXXX").  Accordingly, the carriage is port-to-port.

Autransa picked up the stuffed Container from DALSE.

The Court, therefore, must first determine whether Plaintiff has established that there is no genuine dispute of material fact that Autransa was a subcontractor of Defendant. The answer to this question bears on the relevant time period to be utilized by the Court in determining if the Cargo was in "good condition." Defendant does not dispute that the Cargo was delivered, for purposes of COGSA liability, at 14:04 UTC on June 23, 2016 when it reached the Terminal. Pl. 56.1 ¶ 16. However, Plaintiff argues that the Cargo was delivered earlier at approximately 10:45 UTC when Autransa left DALSE with the stuffed Container. Thomas Report at 2; Pl. Mem. at 9. If Autransa was a subcontractor of Defendant, the Cargo was "delivered" at that time, when Autransa picked up the stuffed Container from DALSE. If not, it was delivered at 14:04 UTC on June 23, 2016 when the Cargo reached the Terminal. *See* Pl. ¶ 16.

To support its argument, Plaintiff relies on the following evidence. First, Plaintiff points to a "Load Order" which Plaintiff alleges is between Defendant and Autransa. Load Order at 3. The document lists Defendant's name and address in the header. *Id.* It states Autransa is the carrier and indicates that the Load Order corresponds to Container TEMU939350, the Container at issue in this case, for pickup at Concasa Terminal and delivery to Juan Carlos 1. *Id.* It lists B. Abaad as the shipper. *Id.* Plaintiff's other evidence consists of the declarations of Miguel Divasson Del Fraile ("Divasson") on behalf of DALSE and Alimentias. Pl. Opp. at 11 n.6 (citing declarations in support of argument); Divasson Alimentias Decl. ¶ 5; Divasson DALSE Decl. ¶¶ 5–6.[11] However, Divasson's declaration on behalf of Alimentias does not mention Autransa; instead, it states that "[Defendant] released container no. TEMU9393650 (the

---

[11] Divasson is an "authorized person by the board" of DALSE and the Chief Executive Officer and General Manager of Alimentias. Divasson DALSE Decl. ¶ 1.

"Container"), and transported and/or arranged for transportation of the Container from and to the container yard(s) for Cargo loading." Divasson Alimentias Decl. ¶ 5. Divasson's declaration on behalf of DALSE states that "DALSE did not [] transport or make arrangements for the transport of this shipment of the Cargo" and "[i]t is [Divasson's] understanding that [Defendant] was responsible for arranging for the [transportation] of the Container and that [Defendant] retained Autransa to perform this service." Divasson DALSE Decl. ¶¶ 5–6.[12]

Defendant argues that Divasson "admitted, in both capacities, that he has no knowledge of the trucking arrangements" and bases his knowledge on the Load Order. Def. Opp. at 15. Defendant further argues that the Load Order does not indicate that Defendant retained Autransa. *Id.* Instead, the Load Order "only concerned the pick-up of the empty container and generator set from the terminal so it could be transported to the DALSE facility for stuffing" and it only recorded "[Defendant's] name at the top, as it was [Defendant's] equipment." *Id.*

Viewing the evidence in the light most favorable to the non-moving party, the Court finds that Defendant has "cast enough doubt on [Plaintiff's evidence] to raise a genuine issue of material fact" precluding summary judgment. *See Transatlantic Marine Claims Agency*, 137 F.3d at 100 (stating that one way a defendant in a COGSA case can preclude summary judgment is by attacking the plaintiff's evidence). Although the Load Order suggests that Defendant retained Autransa, it does not clearly establish that fact. Moreover, the declarations from Divasson only establish that DALSE did not make the trucking arrangements. There is a possibility that B. Abad or some other entity arranged for Autransa to transport the stuffed

---

[12] Defendant asks the Court to exercise its "broad discretion under Rules 26 and 37 of the Federal Rules of Civil Procedure and otherwise to preclude consideration of testimony by [DALSE witness Divasson] who w[as] without justification not timely disclosed during the discovery period." Def. Opp. at 12. The Court recognizes that it has "wide discretion" to preclude the testimony, but that doing so would be an "extreme sanction." *Outley v. City of New York*, 837 F.2d 587, 590–91 (2d Cir. 1988). The Court, therefore, declines to do so.

Container from DALSE to the Terminal. Based on the evidence, a reasonable jury could conclude either that Defendant did or did not subcontract with Autransa to truck the stuffed Container from DALSE to the Terminal. Therefore, an issue of material fact exists as to whether the Cargo was delivered to Defendant at 14:04 UTC, or earlier.

### 2. Condition

Plaintiff further argues that even if "delivery" did not take place for liability purposes until 14:04 UTC, when the Cargo was delivered to the Terminal, it can still establish its *prima facie* case because the Cargo was in good condition when it arrived at the Terminal. Pl. Mem. at 9. In other words, Plaintiff argues that even if Autransa was Plaintiff's agent, not Defendant's, the Cargo was in good condition when it was delivered to the Terminal at 14:04 UTC on June 23, 2016.[13]

Plaintiff must "prove by a preponderance of the credible evidence that the (goods) were delivered to the vessel in good order and condition." *Caemint Food, Inc. v. Brasileiro*, 647 F.2d 347, 354 (2d Cir. 1981) (internal quotation marks and citation omitted). Plaintiff may "satisfy its burden by, for example, submitting the testimony of one who observed the loading of the goods into a container, or by showing that the goods were prepared and packaged in accordance with proper procedures and were carried to the ship under conditions that should have prevented any damage to the contents en route." *Am. Home Assurance Co. v. ZIM JAMAICA*, 296 F. Supp. 2d 494, 500–01 (S.D.N.Y. 2003) (internal quotation marks and citations omitted).

The Court finds that there are two relevant time periods for purposes of assessing the Cargo's condition prior to its delivery to the Terminal at 14:04 UTC. First, the period before the

---

[13] As previously discussed, there is no dispute that at this time the Cargo was in Defendant's custody under the Sea Waybill. *See* Pl. 56.1 ¶ 16.

Cargo was stuffed into the Container. Second, the time during which the Container was stuffed and then transported to the Terminal.

There is evidence that the Cargo was in good condition prior to being stuffed. First, Plaintiff has submitted microbiological test results from third party laboratories that verify the Cargo's condition and demonstrate that it was "free from potentially harmful microorganisms." Divasson Alimentias Decl. ¶ 7; ECF No. 38-5 (untranslated test results); ECF No. 39-9 at 7–26 (translated test results). Defendant argues that these test results do not demonstrate that the Cargo was in good condition because "cheese can ripen and lose shelf-life without the presence of such biological hazards." Def. Opp. at 5. Defendant, however, adduces no evidence to support this claim and the Court finds its argument unpersuasive.

Second, to demonstrate that the Cargo was properly stored while at DALSE before it was stuffed, Plaintiff relies on (1) a certification from DALSE that the Cargo was maintained at 2–5.5 degrees Celsius when it was stored in DALSE's warehouse, ECF No. 38-15, and (2) a declaration from Divasson stating that the "Cargo was maintained at the requisite temperature . . . while the [Cargo] was in the care, custody, and control of DALSE," Divasson DALSE Decl. ¶ 9. Defendant attacks Divasson's observations on the ground that "personal knowledge of a post-claim investigation of a cargo handled by a third-party is not personal knowledge of the condition and care of the particular cargo in question." Def. Opp. at 4 (internal quotation marks omitted). Defendant also contends that the certification from DALSE is insufficient because it does not provide details about the "precise condition and care afforded to the goods before shipment," and is only signed by "DALSE." *Id.* However, Divasson attests to the veracity of the certification in his declaration. Divasson DALSE Decl. ¶ 9.

Considering the above, the Court finds that the record is "devoid of any evidence" that

contradicts Plaintiff's claim that the Cargo was in good condition before it was stuffed into the Container. *See Thyssen, Inc. v. S/S Eurounity*, 21 F.3d 533, 538 (2d Cir. 1994) ("The record is devoid of any evidence that controverts [the plaintiff's] claim that the notations on the bills of lading indicate anything other than the sound condition of the steel upon loading."). Defendants attacks are entirely unsupported and, therefore, insufficient.

However, there are disputed material facts as to whether the Container was stuffed and transported in a manner that might have damaged the Cargo before it arrived at the Terminal. To establish that the Cargo was stuffed at appropriate temperatures, Plaintiff relies on the following evidence: (1) a declaration from Divasson, which states that DALSE "took temperature measurements at certain intervals of loading, and consistent with DALSE's practice, these temperatures were recorded on the Work Record," Divasson DALSE Decl. ¶ 7(c), (2) the Cargo's temperature never rose above 3.5 degrees Celsius during stuffing, *id.*, and (3), the "Work Record" which lists the temperatures DALSE recorded while the Cargo was being stuffed, ECF No. 38-12 (untranslated record with photograph of temperature); ECF No. 39-9 at 2 (translated version of Work Record).[14]

Defendant argues that the Cargo was not in good condition when it arrived at the Terminal because neither the Container nor the Cargo was pre-cooled at the time of stuffing. Def. Opp. at 5; Def. Mem. at 3, 12, 20, ECF No. 37. In support of its arguments, Defendant points to the Raw Data Report and the findings of its expert Arun Jolly.

Beginning with the Raw Data Report, the Container's return air was 21.50 degrees Celsius and the supply air was 21.18 degrees Celsius at 8:00 UTC on June 23, 2016,

---

[14] The translated version of the Work Record does not list any temperature measurements during loading. ECF No. 39-9 at 2.

approximately twenty minutes before Plaintiff alleges the Container was stuffed. Raw Data Report at 2; Thomas Report at 2. The recorded return air temperature readings remained close to that temperature for three hours, until 11:00 UTC, when it dropped to 9.55 degrees Celsius, presumably because the Refrigeration Equipment was turned on at 10:22 UTC. *Id.* The return air temperatures at 12:00 and 13:00 UTC were close to the acceptable range, 4.96 and 4.22 degrees Celsius respectively. Raw Data Report at 2, ECF No. 39-7. At 14:00 UTC, minutes before the Container was delivered to the Terminal at 14:04 UTC, the return air temperature had spiked back up to 8.02 degrees Celsius. *Id.*

Upon a review of the Raw Data Report from the Container, Defendant's expert Jolly concluded that "the [C]ontainer was not properly pre cooled prior to accepting the shipment and the product was loaded warm in the container." Jolly Report at 5.

Plaintiff's expert, Wayne Thomas, appears to concede that pre-cooling did not occur, but concludes that it may not have been necessary because it is not "applicable in all situations as there is the danger of condensation" and because the Cargo was "likely stored at or near [its] carriage temperature of 2 [degrees Celsius] prior to being loaded into the [C]ontainer, [it] undoubtedly would possess a reserve cold energy mass that would limit the work the [Refrigeration Equipment] needed to do in order to reduce the ambient temperature of the air within the box once stuffing was completed." Thomas Report at 9. However, Thomas admits that he is "unfamiliar with this particular cargoes' packing instructions, which would tend to stipulate whether or not a cargo requires pre-cooling" and that he is unable to "ascertain any effects due to no pre-cooling of the [C]ontainer being carried out" because he has "not been provided with any loading pulp temperatures." *Id.*[15] In other words, although Thomas does not

---

[15] Although Thomas's report does not define "pulp temperatures," the Court understands this term to mean the

think that the failure to pre-cool the Container damaged the Cargo, his report does not state that fact definitively. Divasson's declaration, on behalf of Alimentias, states that "[w]hile these [c]heeses can withstand higher ambient temperatures for short periods because the [c]heeses retain some [of] their residual cool temperatures, exposure for longer periods of time would adversely affect the condition of the [c]heeses." Divasson Alimentias Decl. ¶ 13.

Therefore, even if delivery took place at 14:04 UTC when the Container was delivered to the Terminal, an issue of material fact exists as to the condition of the Cargo at the time it was delivered. *See Del Monte Fresh Produce Int'l Inc. v. M/V CAP DOMINGO*, No. 02 Civ. 9544, 2004 WL 2222166, at *4–5 (S.D.N.Y. Sept. 30, 2004) (denying cross-motions for summary judgment because an issue of material fact existed as to the cargo's condition at the time of delivery). There is evidence that the Cargo was stuffed into a Container that was not pre-cooled and then subjected to temperatures well above 2 degrees Celsius for several hours. On the other hand, Plaintiff's expert, and Divasson, suggest that the exposure may not have caused the damage at issue here.

Because an issue of material fact exists as to (1) when the Cargo was delivered and (2) whether it was delivered in good condition, Plaintiff's motion is DENIED. Likewise, Defendant's motion for summary judgment is similarly DENIED to the extent that it is based on the argument that Plaintiff has failed to establish its *prima facie* case.

### B. Defendant's Motion for Summary Judgment

Defendant also moves for summary judgment on the ground that the Sea Waybill absolves Defendant of liability, regardless of Plaintiff's ability to make out a *prima facie* case

---

internal temperature of the Cargo. *See Temperature Claims 101 — Pulp Temperatures*, United World Transp. (Jan. 15, 2018), https://unitedworldtransportation.com/temperature-claims-101-pulp-temperatures/.

under COGSA.  Def. Mem. at 13–24.  Defendant points to four provisions in support of its position.

### 1.   COGSA and the Sea Waybill

Specific liability limitations contained in the Sea Waybill can prevail over the general provisions of COGSA.  "By its terms, COGSA only applies to shipments from United States ports to ports of foreign countries and vice versa."  *Kawaski Kisen Kaisha Ltd. v. Regal-Beloit Corp.*, 561 U.S. 89, 96 (2010).  However, "[a] carrier and a shipper can extend COGSA so that it applies prior to loading and subsequent to discharge of goods from a ship, but the extent of any application beyond the scope of the statute is a matter of contract."  *Hartford Fire Ins. Co. v. Orient Overseas Containers Lines (UK) Ltd.*, 230 F.3d 549, 557 (2d Cir. 2000).  In that case, COGSA applies "only by virtue of contract and not *ex proprio vigore*."  *Id.*; *see also Colgate Palmolive Co. v. S/S Dart Can.*, 724 F.2d 313, 315 (2d Cir. 1983) ("Parties may contractually extend COGSA's application beyond its normal parameters.  When they do so, however, COGSA does not apply of its own force, but merely as a contractual term.").  When COGSA applies "[a]s a rule adopted by and in a contract, [it] is modifiable by other language contained in the [Sea Waybill]."  *Hartford Fire Ins. Co.*, 230 F.3d at 557.

By stating that COGSA applies "save as otherwise provided herein," Section 6 of the Sea Waybill, the provision extending COGSA, explicitly recognizes that, with the exception of Section 5, other sections of the Sea Waybill can limit COGSA's applicability.  Sea Waybill § 6.1.  *See Hartford Fire. Ins. Co.*, 230 F.3d at 557 (construing similar language to "envisage[] the possibility that other provisions of the very same bill of lading will provide for a law other than COGSA for certain portions of the shipment").[16]

---

[16] The last sentence of Section 6 reinforces this conclusion by stating that "[e]xcept for clause 5, every other term,

### 2. Section 5

First, Defendant moves for summary judgment on the ground that Section 5 absolves Defendant of liability for any damage that occurred before or after the Cargo was loaded onto the vessel because it issued a port-to-port Sea Waybill. Def. Mem. at 16–18. The Court has already considered and rejected this argument. *See supra* Section II.A.1.

### 3. Section 11.2(d)

Next, Defendant argues that Section 11.2(d) absolves it of liability, regardless of COGSA, because neither the Container, nor the Cargo, were pre-cooled prior to stuffing. Def. Mem. at 3, 12, 20; Def. Reply at 10–11. Section 11.2(d) provides that "[i]f a Container has not been packed by or on behalf of the Carrier . . . [t]he Carrier shall not be liable for loss of or damage to the Goods caused by . . . packing refrigerated Goods that are not properly pre-cooled to the correct temperature for carriage or before the refrigerated Container has been properly pre-cooled to the correct carrying temperature." Sea Waybill § 11.2(d). Defendant argues that Section 11.2(d) eliminates its potential liability because the high return air-temperatures at the time the Cargo was stuffed demonstrate that neither the Cargo, nor the container was pre-cooled prior to packing. Def. Mem. at 3. The Court already considered this argument in Plaintiff's summary judgment motion and, even construing all facts in favor of Defendant, held that a genuine issue of material fact exists as to whether the Cargo and Container were properly pre-cooled. Accordingly, Defendant's motion for summary judgment on the basis that there was inadequate pre-cooling is similarly DENIED.

### 4. Sections 11.2(c) and 12.1

---

condition, limitation, defence and liberty whatsoever contained in this Sea Waybill shall apply to carriage in the US Trades." Sea Waybill § 6.1.

Finally, Defendant argues it is not liable because the Sea Waybill requires that the Cargo be delivered "with all the [C]ontainer's [Refrigeration Equipment] settings already in place for the [Carrier] at the [Terminal]." *Id.* at 20. Defendant points to two provisions, both of which limit Defendant's liability for damage to the Cargo resulting from "the incorrect setting of any refrigeration controls" or "temperature controls" on the Container in certain circumstances. Sea Waybill §§ 11.2(c), 12.1. Defendant argues that the refrigeration and temperature controls were improperly set because the Container's Refrigeration Equipment start-stop switch was set to the off position when the Container was delivered to the Terminal. Def. Mem. at 20–21, ECF No. 37. Defendant argues that "there is no conceivable scenario in which 'off' while connected to power could possibly constitute a correct setting." *Id.* at 21.[17]

### i. Section 11.2(c)

Section 11.2(c) provides that "[i]f a Container has been not been packed by or on behalf of the Carrier . . . [t]he Carrier shall not be liable for loss of or damage to the Goods caused by . . . the unsuitability or defective condition of the Container or the incorrect setting of any refrigeration controls thereof, provided that, if the Container has been supplied by or on behalf of the Carrier, this unsuitability or defective condition would have been apparent upon inspection by the Merchant at or prior to the time when the Container was packed." Sea Waybill § 11.2(c).[18]

The parties' disagreement centers around whether this provision applies. Specifically, the parties dispute whether Defendant can be liable if the "incorrect setting of any refrigeration

---

[17] Defendant alleges that the Container was connected to a generator for power while being transported from DALSE to the Terminal. Def. Mem. at 4–5 n.2; *see also* Load Order.

[18] There is no dispute that the Container was not stuffed on or on behalf of the Carrier as DALSE stuffed it for Plaintiff through Alimentias. Similarly, there is no dispute that the Container was supplied "by or on behalf of the Carrier." *See* Def. Opp. at 7 ("Furthermore, the [Container] belonged or was under lease to [Defendant].").

controls" was not apparent upon inspection when the Container was stuffed.  Plaintiff argues that this provision is inapplicable because "the scope of [this provision] clearly contemplates the 'incorrect setting of any refrigeration controls' at the time the container is delivered to [DALSE] for loading" because "provided that" introduces the "parties' intent to impose an obligation on the shipper to inspect the container for apparent issues and defects 'at or prior to the time when the Container was packed.'"  Pl. Opp. at 19–20.  Because the alleged "incorrect setting of any refrigeration controls" was that the Refrigeration Equipment's power switch was turned off at 13:47 UTC, after the Container left DALSE but before it arrived at the Terminal, this "incorrect setting" could not have been apparent to Plaintiff when the Container was stuffed.  Defendant counters that the "provided that" language only refers to "this unsuitability or defective condition" and not to "the incorrect setting of any refrigeration controls" and, therefore, "there is no requirement that the incorrect settings must have been apparent to [Plaintiff] upon inspection."  Def. Reply at 9.

"A contractual term is ambiguous where it may be ascribed conflicting reasonable interpretations."  *Rogath v. Siebenmann*, 129 F.3d 261, 267 (2d Cir. 1997) (internal quotation marks and citation omitted).  "[C]ontracts for carriage of goods by sea must be construed like any other contracts: by their terms and consistent with the intent of the parties."  *Norfolk S. Ry. Co. v. Kirby*, 543 U.S. 14, 31 (2004).  On one hand, Defendant's literal reading is entirely plausible—by omitting "incorrect setting of any refrigeration controls" from the "provided that" clause, the drafter may have intended for Defendant to be absolved of all liability stemming from the "incorrect setting of any refrigeration controls," even when those settings would not have been apparent upon inspection at or prior to the time the Container was stuffed.  On the other hand, Section 11 contains several clauses, each of which limits Defendant's liability stemming

from damage caused by improper stuffing of the Container, when the Container has not been stuffed by or on behalf of Defendant.  *See, e.g.*, Sea Waybill § 11.1 (requiring Plaintiff to inspect the Container for suitability for carriage of the Cargo before packing); *id.* § 11.2(a) (eliminating Defendant's liability for damage caused by improper stuffing); *id.* § 11.2(b) (eliminating Defendant's liability for damage caused by "the unsuitability of the Goods for carriage in the Container supplied"); *id.* § 11.2(d) (eliminating Defendant's liability for damage caused by stuffing the Cargo into a Container that has not been properly pre-cooled).  It defies logic to include a provision absolving a defendant from liability due to damage caused by incorrect refrigeration controls *at any point* in the shipping process within a provision that is targeted at limiting liability from a particular time period (the stuffing of the Container).  This is particularly true when there is another provision in the contract that also limits liability arising from improper temperature exposure.  *See id.* § 12.1.  Because both interpretations are reasonable, the Court finds that Section 11.2(c) is ambiguous.

Generally, the interpretation of an ambiguous contract is a "question of fact and summary judgment is inappropriate."  *Rogath*, 129 F.3d at 267 (internal quotation marks and citation omitted).  However, if there is no "relevant extrinsic evidence of the parties' actual intent," ambiguity "is not enough to preclude summary judgment."  *Mellon Bank, N.A. v. United Bank Corp. of N.Y.*, 31 F.3d 113, 116 (2d Cir. 1994); *see also Williams & Sons Erectors, Inc. v. S.C. Steel Corp.*, 983 F.2d 1176, 1184 (2d Cir. 1993) ("Ambiguity without the existence of extrinsic evidence of intent presents not an issue of fact, but an issue of law for the court to rule on.").

Here, the Court must interpret the Sea Waybill as the parties have introduced no extrinsic evidence.  "Ambiguities in a bill of lading should be interpreted against the [Defendant], as such contracts are considered to be contracts of adhesion."  *Siaci Saint Honore v. Ironbound Express,*

*Inc.*, 884 F. Supp. 2d 100, 106 (S.D.N.Y. 2012).[19]  The Court, therefore, interprets the provision to only limit Defendant's liability for damages resulting from "the incorrect setting of any refrigeration controls" if the incorrect setting would have been apparent upon inspection at or prior to the time the Container was stuffed.  In other words, it is inapplicable to the current case because the alleged "incorrect setting" arose after the Container was stuffed.  Accordingly, Defendant's motion for summary judgment is DENIED to the extent that it relies on Section 11.2(c) of the Sea Waybill.[20]

### ii.  Section 12.1(c)

Next, Defendant argues that Section 12.1 absolves it of liability because the Refrigeration Equipment was powered off when it was delivered.  Def. Mem. at 20–21; Def. Reply at 11–12.

Section 12.1 provides that

> Special containers with refrigeration, heating or insulation shall not be furnished unless contracted for on the front of this Sea Waybill and extra Freight paid.  If a carrying temperature is noted on the front of this Sea Waybill, the Merchant shall deliver the Goods to the Carrier at plus or minus 2 degrees Celsius from the noted temperature, and the Carrier shall exercise due diligence to maintain such supply air temperature, plus or minus 2 degrees Celsius while the Goods are in its possession.  IT IS THE MERCHANT'S OBLIGATION TO SET AND/OR CHECK THAT THE TEMPERATURE CONTROLS ON THE CONTAINER

---

[19]  The Sea Waybill is analogous to a bill of lading because it is "the document evidencing the contract of carriage." *Allied Chem. Int'l Corp. v. Companhia de Navegacao Lloyd Brasileiro*, 775 F.2d 476, 482 (2d Cir. 1985); *see also Kawaski Kisen Kaisha Ltd.*, 561 U.S. at 94 ("A bill of lading records that a carrier has received goods from the party that wishes to ship them, states the terms of carriage, and serves as evidence of the contract for carriage." (internal quotation marks and citation omitted)).

[20]  Moreover, even if the Court interpreted the provision as Defendant does, it would still deny Defendant's motion for summary judgment because a genuine issue of material fact exists as to whether the Refrigeration Equipment being switched to "off" was an incorrect setting.  Defendant's expert, Jolly, opines that it was.  *See* Jolly Decl. ¶ 4, ECF No. 40-4 ("[T]he unit had been improperly switched off while connected to its generator set shortly before it was tendered to the terminal and the EIR was issued.").  As previously discussed, the EIR Report was generated at 14:04 UTC when the Autransa truck carrying the Container entered the Terminal.  *See* EIR Report at 1.  Jolly further contends that the EIR report stated "LIVE REEFER: NO" because the unit had been switched off 17 minutes earlier, and, therefore, the EIR Report merely memorialized that the Refrigeration Equipment was not powered on.  Jolly Decl. ¶ 3, ECF No. 40-4.  Plaintiff's expert, Thomas, concluded that it was proper for Autransa to turn the Refrigeration Equipment off prior to entering the terminal in preparation for offloading it from the truck and "eventual stacking into a reefer rack at the terminal."  Thomas Report at 11.  Thomas states that the "LIVE REEFER: NO" in the EIR report *mistakenly* instructed the "terminal electricians to leave the [C]ontainer unplugged and turned off."  *Id.* (emphasis added).

ARE AT THE REQUIRED CARRYING TEMPERATURE AND TO PROPERLY
SET THE VENTS. The Carrier does not undertake to deliver empty refrigerated
Containers to the Merchant at any specific temperature. The Carrier has the right
but not the obligation to refuse any Container loaded by the Merchant for shipment
where the Goods are not or were not loaded into the Container within plus or minus
2 degrees Celsius of the contracted carrying temperature.

Sea Waybill § 12.1. Defendant argues that "temperature controls" includes the "on/off switch" for

the Refrigeration Equipment. Def. Reply at 11, ECF No. 43.

The Court finds that the meaning of "temperature controls" within Section 12.1 is

ambiguous. On the one hand, Section 12.1 repeatedly references "temperature" specifically,

rather than refrigeration more broadly. *See, e.g.*, Sea Waybill § 12.1 ("The Carrier does not

undertake to deliver empty refrigerated Containers to the Merchant at any *specific temperature*.")

(emphasis added). It is reasonable, therefore, to read "temperature controls" to refer to the

specific temperature setting (e.g., 2 degrees Celsius), rather than the Refrigeration Equipment's

on/off switch. Moreover, Section 11.2(c), the provision previously discussed, mentions "any

refrigeration controls," and, therefore, one could argue that "any refrigeration controls"

encompasses the Refrigeration Equipment's on/off switch, whereas "temperature controls" refers

to a control which sets the temperature within the Container. Conversely, it is hard to see how

the "temperature controls on the[C]container" could be at the "required carrying temperature" if

the Refrigeration Equipment is not turned on, and, therefore, it is also reasonable to read this

provision to include the Refrigeration Equipment's on/off switch.

Again, because the parties have not introduced any extrinsic evidence regarding their

intent, the Court must interpret the provision. The Court construes the ambiguity against

Defendant, *Siaci*, 884 F. Supp. 2d at 106, and finds that Section 12.1 does not limit Defendant's

liability because "temperature controls" does not include the Refrigeration Equipment's on/off

switch.  Defendant's motion for summary judgment is DENIED to the extent it is based on Section 12.1 of the Sea Waybill.[21]

## CONCLUSION

For the reasons stated above, both motions for summary judgment are DENIED.  The Clerk of Court is directed to terminate the motions at ECF Nos. 36 and 38.  Plaintiff's claims under COGSA and state law are set for trial on **October 1, 2019**.

SO ORDERED.

Dated: August 21, 2019
New York, New York

_____
ANALISA TORRES
United States District Judge

---

[21] Moreover, even if the Court held that "temperature controls" encompassed the Refrigeration Equipment's on/off switch, it would still deny summary judgment as a material issue of disputed fact remains regarding whether the Refrigeration Equipment was supposed to be powered on at that time.  *See supra* note 20.